Case number 13-6153 Kentucky for the Commonwealth at all versus United States Army Corps of Engineers at all. Incorporated argument not to exceed 15 minutes for the plaintiffs and 15 minutes to be shared by the defendants. Mr Gormley, you may proceed for the appellate. Good afternoon, Your Honors, and may it please the Court. Neal Gormley on behalf of Plaintiff Appellants Kentucky for the Commonwealth and Sierra Club. I plan to focus this afternoon on the National Environmental Policy Act, or NEPA, claims, and I'll address the Clean Water Act claims briefly if time permits. I'd like to reserve four minutes for rebuttal. The main issue in this appeal is whether the environmental laws allow the Army Corps of Engineers to ignore public health when it authorizes surface coal mining. Uncontested evidence in the record suggests that surface coal mining at Stacy Branch will subject the residents of eastern Kentucky to increased risk of cancer, heart disease, birth defects, and other serious health problems. Will those result from the deposit of the spoil in the bowels? The record correlates those health problems, Your Honor, with surface coal mining, and that's the activity that the Army Corps of Engineers authorized to occur in streams. Under your theory, does that mean that all surface mining in Kentucky would have to stop? No, Your Honor. NEPA is a procedural statute. It doesn't require any substantive results. It simply requires that the Corps take a hard look at the public health consequences of the activity that it authorized here—surface coal mining in streams protected under the Clean Water Act. The Corps' refusal to even consider the evidence of serious public health harms violated NEPA for three reasons. First, because the Corps has regulatory control over the entire mine, including authority to protect public health. Second, because the Corps considered the benefits of the entire mine. And third, because the Corps authorized mining directly in streams—in 1.86 miles of streams that interlace this two-square-mile mine site. The first reason why the Corps was required to consider the public health impact of mining is because it has regulatory authority over the entire mine. Under 33 CFR 320.4, the Corps is required to conduct a public interest review of the entire mine. And under 33 CFR 325.4, the Corps is empowered to impose conditions to protect the public interest. But I thought the approval that you were challenging was an approval for the deposit of this soil, or what it's called, into these—into those several miles of streambed. Is that correct? Your Honor, the requirement for a permit is triggered by LECO's need to mine in these streams. And that's what the Corps is approving? The Corps—what the Corps specifically approves, and what the permit expressly allows, is disposal of mine waste in streams, mine waste treatment in streams, and mining through the streams. That is what the permit expressly authorizes, and that is what the Corps' decision describes as the project that has been approved. If the mining company were not allowed to do that, then they would be able to proceed with the whole mining project. Exactly. And so, therefore, because of that connection, the Corps has to take into account all the effects of the whole mining project. Is that right? That's correct, Your Honor. It's a little counterintuitive that the approval for part of the project requires them to take into account the effects of the entire project. Your Honor, the test— It's certainly half. How do you respond to this? Yes, Your Honor. The test under NEPA is whether—for whether the Corps must consider the effects of the entire project is whether the Corps has regulatory control of the entire project. That's what the Corps' own regulation requires. That's what NEPA requires. That's what CEQ regulations require. That's also the test that was articulated in a case that the government cited in its brief, but that we unfortunately missed, Southwest Williamson County. And that case discusses and applies 40 CFR 1508.18, which is a CEQ regulation that requires—that directs that the scope of review and what a major federal action is, is the entire project that's potentially subject to federal control and responsibility. How do you distinguish this Aracoma case out of the fourth, sir? Your Honor, Aracoma was a very different case because it was about riparian and aquatic impacts of valley flows. And those impacts are extensively regulated under SMACRA. Those are a central concern of SMACRA. This case is about public health impacts, and Kentucky does not address public health under SMACRA, and the defendants don't even claim that Kentucky does. Could it? Your Honor, we're not aware of any authority that empowers Kentucky to consider these public health risks under SMACRA. You don't think Kentucky could consider public health risks under SMACRA? Your Honor, what's clear from the briefs is that Kentucky's not required to. Maybe Kentucky could amend its SMACRA program and broaden it to encompass public health risks, but it hasn't done that. And the bottom line is that if the Corps doesn't consider these public health risks, no agency will. The reason why the Corps has control and responsibility over the entire mine is that it is empowered to impose conditions on the entire mine to protect public health. 33 CFR 325.4 provides that the Corps will impose conditions to protect the public interest, including the needs and welfare of the people. That's regulatory control over the entire mine. What's the state's motion to do here? Your Honor, the state has overlapping authority under SMACRA. There are things under SMACRA that the state is empowered to regulate, and there are things under the Clean Water Act that the Corps is empowered to regulate. The Corps has exclusive authority to police the public interest when it issues a permit for this mine. The state has its own responsibilities. It's required to address the stability of the mine, the hydrology impacts. There are a lot of performance standards under SMACRA. But the key is that Kentucky's overlapping authority under SMACRA does not erase the Corps' independent Clean Water Act authority in corresponding NEPA obligations. Another one, please. Yes, Judge Keeton. Oh, excuse me. Please go ahead, Judge Keeton. Please go ahead. Okay. In conflict with the Corps' failure to consider the health-related history of surface-mining under the National Environment Policy Act, our referral is appreciated. Is that our standard of review? Our argument, Your Honor, is that it was unlawful, that it was a violation of NEPA, and it was also a violation of the Corps' own NEPA implementing regulations. NEPA and SMACRA simply do not allow – What's the answer to Judge Keeton's question? Our challenge is not really an arbitrary and capricious challenge, although there are components of the Corps' reasoning that were arbitrary and capricious. Our challenge is – our theory is that the Army Corps of Engineers violated NEPA, and it violated SMACRA, and it violated its own regulations by failing to even consider these public health impacts. Another reason why the Corps was required to consider the public health impact of mining is that it authorized mining directly in 1.86 miles of streams that interlace this mine site. The mine site is two square miles. This is apart from the 1.5 miles of streams in which waste disposal will occur. 1.86 miles of streams that will be mined through. And the record is clear that mining through a stream means excavating the stream to extract coal. This is surface coal mining. The Corps' regulations unambiguously require it to do a full NEPA analysis for the activity that it authorizes in streams. The Corps' post hoc justification that it offers in this court that all it authorizes was discharges and not mining through the stream is contrary to the record, as I've explained. It's contrary to what the permit says. It's contrary to what the decision says. And it's also contrary to the unambiguous requirements of the Corps' own regulations. There's simply no way to read 33 CFR 325 Appendix B7B. It's a mouthful. What's your best case narrative? Your Honor, our best cases are all of the cases that hold that another agency's overlapping jurisdiction does not limit a federal agency's NEPA responsibilities. That's the law in the D.C. Circuit. And I would say Calvert-Cliffs and Idaho v. ICC. That's the law in the Third Circuit. And I would cite from that point Newark Ecology Action Network. And that was the law in the Fourth Circuit before Aracoma Coal. North Carolina v. FAA. Your Honor, Aracoma Coal did not even address any of this law. The statutory NEPA analysis in Aracoma is a single sentence in a footnote. This Court should not follow Aracoma and hold that the overlapping authority of a state erases a federal agency's substantive obligations or its NEPA obligations. Did the Court deem that it was not permitted to regulate this? Or did it rely instead on the regulatory umbrella of SMAGRA? Your Honor, which is a fairer reading of what they did? The Court did not determine that it had no authority to regulate. It determined that it was the issue whether it passed that authority or not. Your Honor, if that's the test for how extensive the Court's NEPA review must be, its NEPA review must be coextensive with its Clean Water Act authority. I see that I'm out of time. I'd like to reserve the remaining time for rebuttal. Sir. Mr. Dodger. Good afternoon. David Dodger from the Department of Justice here on behalf of the Army Corps of Engineers. I plan to spend 12 minutes of the appellee's argument time today explaining why this Court should affirm the judgment of the District Court. Federal statutes provide for overlapping permitting systems for service coal mining operations. Some of those permits, like the primary permit that LICO obtained here for service coal mining operations under SMAGRA, are state permits. That program has been delegated to Kentucky's exclusive jurisdiction. And other grants, like the Section 404 permit that's directly issued in this case, are federal permits. But NEPA applies only to federal actions. And so the question before the Court in this case is where to draw a line between those environmental effects that arise from the effects of service coal mining operations in Kentucky's exclusive jurisdiction and which effects arise from the discharge of dredger-filled material into the waters of the United States, which is where the Court's jurisdiction lies. Your opposing counsel says it's not just discharge but also mining through streams. Is that correct? Mining through streams is the term, but it is the discharge that is the aspect of it that the Court regulates. So first let me explain what I see as the distinction. The activity mined through streams, this is mountaintop removal mining. And so a layer of overburden is removed from on top of the coal, exposing the coal seam underneath. In order to remove that overburden, excavating equipment has to take off an entire layer of soil, some of which contains the channels and beds for ephemeral streams that fill with water during the rain events. What's ephemeral mean? Ephemeral means that there's only water in those channels when there's rain, when there's water level. So in the course of scraping that top layer off, dirt is deposited into those channels and then is removed with the rest of the overburden. But everything that happens after that, how the coal is excavated, what equipment is used, where the overburden is placed, how reclamation can be done, is within Kentucky's exclusive jurisdiction under SPECRA. So to say that the coal is authorizing work in streams is misleading to the extent that the Corps is only interested in those channels to the extent they're filled with discharging dredging from the material. And then the forced- So it's stripped off and then they're filled and it's the filling that gives them the right to deny permit. The filling occurs in the course of removing the top layer of sediment. It's because they're taking it away from there and filling it somewhere else? I'm trying to get to understand what you're saying. Right, I- Somebody's saying they take it away and therefore they're filling it. It sounds contradictory. They fill it in the course of taking it away because all of the sediment in that top layer gets pushed around and moved around. And in the course of that, some of it goes into the stream channels. I see. The Fourth Circuit, in their report, said that the Clean Water Act is unambiguous, that the Corps' jurisdiction is limited to that discharge of dredger-filled material. But without that, the whole line couldn't operate, right? That's right. The Corps acknowledged that this project couldn't go forward unless it permitted that activity. But that is not necessarily unusual in Corps of Engineers permitting projects. And so in this case, the Corps had to define its scope of analysis. The district engineer defined the scope of analysis as the Corps' own NEPA regulations provide. And the Corps limited its scope of analysis to the effects of the activity that it permitted, the discharge of dredger-filled material. What do you do with the Postal Council's argument that public health risks, which they provide some indication exist from the overall mining, don't get regulated at all? Because they suggest it either cannot or certainly is not being regulated under SMACRA by the state. How do you respond to that? My response is that that's not necessarily inconsistent with NEPA. SMACRA provides that when a federal program is delegated – that when a SMACRA program is delegated from OSM, a federal agency, to a state, that delegation action is not subject to NEPA review. And so it's clear that NEPA applies only to federal actions. If there's a gap in who's looking at that public health effect, then it's only an issue under NEPA if the health effects are a result of the federal action here. Do you agree, then, that there's no regulation of this? I haven't looked closely at Kentucky's own procedures for – But your argument is that it – We're not relying on Kentucky to look at the health effects. You're not relying on it so nobody can look at it. Is that the point? I think that Kentucky can look at it. When it delegates – when OSM delegates a SMACRA program to a state, SMACRA sets the floor. The state's program must meet the minimum requirements of SMACRA. So is your argument, then, that to the extent Congress wants these kinds of concerns to be taken into account, they have to be taken into account through the SMACRA process as opposed to the Corps of Engineers process? Is that the idea? I believe so. And so – And we just – since SMACRA isn't before us, we just don't need to look and see whether they govern it or not. I believe so, because to state it more accurately, Kentucky's actions are not before you. The only action that's before you is the Clean Water Act action that the Corps took. So Kentucky takes different actions under SMACRA, and it has exclusive jurisdiction over those actions. So I have to disagree with Mr. Gormley's characterization that SMACRA and NEPA overlap. Perhaps they overlap in the Save Our Criminal Mounds case, because in that case, OSM, a federal agency, had the plenary regulatory authority over serviceable mining operations that SMACRA provides. And so all action in that case is federal. The state didn't have it in that case. That's right. There was no delegated state program in Save Our Criminal Mounds, which took place in Tennessee. Are you admitting that what Mr. Gormley says, that the Corps didn't consider these health effects at all in this procedure, is that correct or not correct? Yes, the Corps chose not to consider the health effects. They're saying not required to. That's right, because those health effects don't arise from federal action. None of the studies – and Mr. Gormley admitted this in his argument – none of the studies on which the plaintiffs rely here connect the health effects that they describe directly to the discharge of dredge or fill material. And that's the activity that the Corps has jurisdiction over under the Clean Water Act. Did the Corps at any point rely on the greater regulatory power, the overarching regulatory power of the state under SMACRA in deciding about health effects? The Corps didn't rely on Kentucky's authority as a way to excuse itself from looking at health effects. Instead, the Corps recognized that Kentucky has exclusive jurisdiction over certain coal mining operations. And so the Corps tried to draw the line between the effects of its action and the effects of Kentucky's action. So the Corps did take into account SMACRA. And the Fourth Circuit in Erickson Coal was right to acknowledge that you can't ignore SMACRA in this circumstance. It's just not the Corps' role to decide whether service coal mining will be allowed in Kentucky. And the public interest review that Mr. Gormley cited to the Court came from the Court's Clean Water Act regulations, not its EGOR regulations. They're not arguing that they're going to decide whether it's allowed. They're arguing that before it's allowed, there should be environmental impact analyzed based on those kinds of considerations. So you're overstating their argument when you say that they're arguing that it shouldn't be allowed. That's fair enough, and I don't mean to overstate their argument. But the Corps was trying to determine what would be the effects of its action. And the Supreme Court, aside from the Corps' EGOR regulations, which are lying in here and which the Court should refer to, the Supreme Court, in Public Citizen and in Marsh, has said that the important thing here is a reasonably close causal relationship between the federal action and the effect, which they liken to probable cause. So here, the discharge of dredge or fill material does bear a but-for relationship to whatever downstream health effects might occur from service mining, because the service mining can't go forward. You're using downstream figuratively now. Yes, I'm sorry. I didn't mean in terms of waters in the United States, but the later, more indirect health effects. Whatever the but-for relationship might be between the Corps' action and those later indirect health effects, it's not a reasonably close causal relationship that is similar to the concept of probable cause. So by refusing to consider those effects, the Corps wasn't violating EGOR. Instead, it was recognizing the roles that Congress has established for the state and for federal agencies. This is actually— It did consider some health effects. It definitely did consider the health effects of the direct discharge of dredge or fill material into waters in the United States. Did it consider any health effects from the so-called mining through of the streams? I don't recall anywhere in the decision where it directly addressed the question of mining through of streams, but certainly it considered— Yes, it talked about the quality of the water and how the water was not adversely affected. That would include any actions of mining through the streams. It would, because the water quality effects that the Corps did consider dealt primarily with runoff into streams and what comes out of the valley fills and into the sediment control ponds, and then is discharged into streams that later on flow to the public water supply intakes and things like that. The Corps did consider those effects. In fact, it even considered non-water quality related effects such as air quality, minor river safety, where those effects related directly to waters in the United States. Where I would refer the Court to look on this is pages 45 to 52 of the decision document. The decision document contains a number of different analyses, including a broader public interest analysis that is required under the Clean Water Act regulations. But the primary place where the Corps made its NEPA determination is pages 45 to 52. That's a section titled Determination, and at the end of that section is where the Court concludes that this action will have no significant impact. And that finding of no significant impact is the operative finding under NEPA that means that the agency does not appear in the EIS. In that section, the Corps did look at all of those effects, primarily at water quality, and that section is quite focused on waters in the United States. It also discusses the benefits of the mitigation plan that the Corps is imposing. So the Corps did rely on the Compensatory Mitigation Plan as a condition of NEPA's permit in order to say that this action will not have significant impact. But in that section, the Corps did not rely on any economic development needs, any national energy needs, or anything like that to find that the action will have no significant impact under NEPA. Those were in a different part of this decision. Yes, there is a different section that is called, I think, All Factors Relevant to this Decision. And the Clean Water Act regulations, which are not an issue here, do prescribe a number of different public interest factors like conservation, economics, aesthetics, wetlands, historic properties. Each of those has a separate bullet point in that section. I think I understand that argument, but I'd like to ask something that wasn't raised by your opponent orally, but was certainly raised in the brief, and that's this scientific wild guess about 80% that they have. I guess what they're suggesting is that this is a number without any basis. Do you know what I'm referring to? I do know what you're referring to. Can you articulate that argument and what your answer to it is? Sure. I have two separate answers. One is that I disagree with the way that issue is framed in the appellate's brief. They claim that it's this 80% number that is a problem, but if you look at the regulations and what the Corps is supposed to look at, that's analyzing different compensatory mitigation options, that regulation really just asks the Corps when it's looking at alternatives to decide which of the alternatives is the most likely to be successful. The Corps did that here. It rejected some early compensatory mitigation options, which it deemed to have a 65% chance of success or a 70% chance of success. It said those aren't high enough, and instead ultimately required the compensatory mitigation plan that NICO settled on and it is a condition of this department. Now, as for the 80% itself, the Corps needs to remember that this is in the context of a compensatory mitigation plan with a lot of technical elements. The Court, in the record, can see some of the worksheets that go into this, and all of that is input by NICO and submitted to the Corps for approval. So the Clean Water Act and NICO don't require the Corps of Engineers to give a detailed explanation for why it accepted each and every one of those numbers. Instead— I see your time is up. Do you have any further questions? Judge Keith, any further questions? Fairly little, I agree. All right, thank you. We'll see what happens. Thank you. Any questions? Good afternoon. Bob McCluskey on behalf of NICO, the permit holder. The first point I'd like to make to the Court, drawing on the company's position, is there's three primary permits that all service lines have to get. The first is a 402 or NPDES permit under the Clean Water Act that governs the discharge of every drop of water that hits this line. It has to flow through an NPDES permitted outlet, which is governed by that permit, which is designed to protect the waters of the Commonwealth, including public drinking water supplies. There is also a service line with SNAPA permit. It governs the movement of every cubic yard of rock and dirt on this site. It requires a soil balance to determine where soil will go, both on the mine site and the valley fields. It has a regraded backfilling plan, re-vegetation plan. It has analyses of the impacts on the surface and groundwater. It has protections on the surface and groundwater and our air emissions. It governs every single piece of rock moved on this site, the smallest. If the water or the air that comes from the mine hurts the health of people that breathe it would be taken into account under SNAPA by the state. SNAPA certainly authorizes permitting and regulatory authorities to issue imminent harm cessation orders anytime they believe there's imminent harm to people for any reason. Any people? Any people. In addition, the permit area here under the SNAPA permit is about 869 acres. The area to be filled under the 404 permit doesn't exceed 2.3 acres. That is the smallest component of this mine compared to any of the permits. Now to the point, this is not a mountaintop mine. It's a contour mine that we call point removal. So the mining through, what happens is it's like driving a road cut. The road goes along a bridge. It will intersect the stream every so often. The stream is restored and that's the filling of the streams. So it's a little bit different than, I'm sure, a mountaintop removal mine or a hand-top removal mine. The court here did evaluate the impacts and some of the protections of the SNAPA permit on public health. In the decision document, it looked at- The court did? The court did. The court did that? The court reviewed the protections accorded by the SNAPA permit in a couple of places. It looked, first example, it noted that under the SNAPA permit there can be no increase in peak flows as a result of defined rainfall events which prevents flooding effects. It looked at public surface water effects. It looked at groundwater effects and noted that there were no well water users close to the mine. SNAPA also requires a replacement of groundwater that is altered by surface water. It looked at- Thank you, Mr. McFluskey. I think your time has expired. Unless Judge Keith or Judge Seiler has a question. I have a question. No, thank you.  You have some rebuttal time. Thank you, Your Honor. With respect to health effects, with respect to whether the court considered health, the court did not consider any of the extensive evidence showing that surface coal mining is correlated with serious health problems, cancer, birth defects, heart disease. It didn't consider one study that showed that the incidence of certain birth defects is 93% higher in counties with surface coal mining. Does any of that- I haven't reviewed it at all. Does any of that suggest that some of those result from the particular activities that- as opposed to you need this permit to have the mine at all. Does any of that result from the particular activities that the court is approving here? Yes, in the sense that it's tied to surface coal mining, which is- Is it more direct? Is there like this- Part of the reason that these health effects happen is a result of filling, or is it just if we didn't have filling, we wouldn't have the mine and these effects may come from something else? Your Honor, this question- No, Your Honor. It's not- Filling in the sense that you mean it is not a subject of the regulations, of the studies, but the studies talk about surface coal mining and the court permitted surface coal mining in the streets. The defendants talk about the court's review of certain environmental protections and the court determined that certain environmental requirements are met, but it never claimed that that showed that there's not going to be a significant impact on public health. The court- If the court did this, it goes back to my original question. If the court says it has an incidence on public health, therefore we're not going to approve, then they would stop all surface mining in Kentucky and maybe every other state, right? Your Honor, the court would not be required- might not be required to stop all surface coal mining. The court would- But they said it was such a detrimental effect on health. What the court would have to examine would be whether there are ways to protect the public interest and protect public health by conditioning the permit. And the court already imposes conditions on these four permits. It imposed conditions that affect the entire mining operation through this very permit. And it would just have to use that authority to address the public health concern. That's a matter of extreme discretion, how the court eventually responds to the public health concern. But there's no discretion about whether it has an obligation under NEPA to at least consider the risk and to conduct an environmental review that's sufficient given that risk. Okay. But-  But- But- But- But- But- But- Yes. Yes, Your Honor. And the reason why we think this court is required to reverse Judge Russell's decision is that the court's failure to consider these health impacts was contrary to the plain language of NEPA, the plain language of SNAPRA, and the plain language of the court's own regulations. The court is subject to more than just a general duty of reasonableness. And where there are regulations that specifically require consideration of the health of the effects of the mine to the extent that the court has Clean Water Act authority to address those concerns, then the court is required to address them under NEPA. Thank you, counsel. Any further questions? Further questions, Judge Heath? Your Honor, may I- You may ask the question first. Thank you very much, counsel. We appreciate the argument. It's very thoughtful. It will be taken under consideration. Again, we welcome you to Leisington. Thank you for coming. And you can-